UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NATALIE SUE WECKBACHER,

      Plaintiff,

vs.

                             Civil Action 2:11-cv-00659
                             Judge Algenon L. Marbley
                             Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

Plaintiff, Natalie Sue Weckbacher, filed this action seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits, child disability benefits, and supplemental security income. Plaintiff alleges that she has been disabled since April 5, 1997, due to a combination of impairments including a head injury, back problems, arthritis, and problems with her concentration and memory.  (*See* R. at 230,257, 279–80, 293.)

Following administrative denials of Plaintiffs' claims, an Administrative Law Judge ("ALJ") held hearings in February 2009, April 2010, and June 2010.  (R. at 1494–1548.)  On July 20, 2010, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 12–26.)  This decision became the final decision of the Commissioner when the Appeals Council denied review on May 25, 2011.  (R. at 4–6.)

Plaintiff thereafter timely commenced this civil action.  In her Statement of Errors,

Plaintiff maintains that the ALJ erred in relying on the testimony of a medical expert who considered materials outside the record.  Additionally, Plaintiff contends that the ALJ erred in concluding that Plaintiff does not have a severe impairment or combination of impairments. Following the Commissioner's Memorandum in Opposition and Plaintiff's Reply, this matter is now ripe for review.  For the reasons that follow, it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner.

## II.  PLAINTIFF'S TESTIMONY

Plaintiff was twenty-seven years old at the time of the June 2010 administrative hearing.[1] (*See* R. at 230.)  Although not discussed at the hearing, Plaintiff attended three years of college after graduating high school.  (R. at 230, 250.)

At the administrative hearing, Plaintiff testified to having been in and out of counseling for years.  (R. at 1543.)  At the time of the hearing, however, Plaintiff was not seeing a psychiatrist, counselor, or any other mental health provider.  (R. at 1533.)  She was taking medication that her family physician prescribed.  (*Id.*)

Plaintiff testified that she had begun a job as a waitress and expected to work twenty to thirty hours per week.  (R. at 1533–34.)  Plaintiff also stated that she had worked in two other waitress positions that year.  (R. at 1535–36.)  Plaintiff's testimony suggests that she was terminated from both of these positions, with one employer citing attitude problems.  (R. at 1536.)  Plaintiff, however, thought her attitude was alright.  (*Id.*)  Plaintiff also reported having a previous part-time job in telemarketing, but she was fired for swearing.  (R. at 1540–41.)

---

[1]  Although the Court also held hearings in February 2009 and April 2010, Plaintiff did not testify at these hearings.

According to Plaintiff, she had lived in six different places since January 2010.  (*Id.*)  She indicated that her living arrangements changed because she was unable to get along with others.  (*See* R. at 1536–38.)

Plaintiff also testified regarding her MySpace page, which a medical expert had considered.  (R. at 1541.)  She noted that the most recent picture, of her and her ex-boyfriend, was from February 2010.  (*Id.*)  Plaintiff stated that she did not remember making an entry regarding a visit with her father.  (R. at 1542.)

### III.  MEDICAL RECORDS[2]

In April 1997, Plaintiff was in a serious motor vehicle accident.  (R. at 386.)  Plaintiff was admitted to the hospital and underwent physical, occupational, and speech therapy.  (R. at 387.)  Speech therapy notes indicated decreased judgment and problem solving skills, but Plaintiff showed improvement in her pragmatic skills during therapy.  (R. at 655.)  Plaintiff experienced no difficulties in working on fraction and reading forms.  (R. at 664.)  During her admission, she underwent standardized testing, which demonstrated "moderate cognitive linguistic and mild communication deficits . . . ."  (R. at 1007.)  Plaintiff also displayed difficulty with higher level cognitive skills such as reasoning and organization.  (R. at 1005.)  An MRI of Plaintiff's brain demonstrated tiny bilateral subdural fluid collections, subcutaneous hemotoma,

---

[2]  The record consists of extensive medical records, which include treatment for both physical and mental conditions.  Despite the voluminous nature of the record, however, Plaintiff does not provide a summary of the record and her briefing includes limited references to the medical evidence.  The Commissioner, for his part, relies on the ALJ's summary of the medical evidence.  As discussed further below, Plaintiff's contentions of error relate to her mental conditions and impairments.  Under these circumstances, in summarizing the medical records and expert testimony, the undersigned will focus on evidence relevant to Plaintiff's mental limitations and impairments.

and a left sphenoid sinus retention cyst. (R. at 728.) Plaintiff's discharge summary reflects that she had a tendency to become emotionally unstable while at the hospital. (R. at 388.) Plaintiff was ultimately diagnosed with traumatic brain injury and discharged on May 13, 1997. (R. at 386, 388.) Plaintiff's doctor described her conditions on discharge as "good." (R. at 389.)

Plaintiff was admitted to Marietta Memorial Hospital on January 3, 1998, because she was threatening to harm herself. (R. at 1137.) These threats came after an argument with her father. (*Id.*) Plaintiff's father reported that she had frequent episodes of anger with threats of suicide. (*Id.*) Plaintiff was diagnosed with oppositional defiant disorder and discharged after signing a no-harm contract. (R. at 1139.)

The record reflects that Plaintiff graduated from high school in May 2001. (R. at 239.) She had a cumulative grade point average of 2.16. (*Id.*) In the twelfth grade she passed proficiency tests in reading and writing, but failed tests for math and science. (*Id.*) Plaintiff's ACT test scores from April and October 2000 placed her in the 18th percentile nationally. (R. at 240.)

In August 2002, Steve W. Howe, D.O., indicated that Plaintiff was experiencing anxiety. (R. at 1086.) Nevertheless, treatment notes reflect that this condition was controlled, at least as of August 2002. (*Id.*)

Plaintiff was admitted to Marietta Memorial Hospital again on April 18, 2004 due to thoughts of suicide. (R. at 1324.) Plaintiff, however, indicated that she made comments regarding suicide to "get [her father] off her back." (*Id.*) Drug testing was positive for amphetamines, barbiturates, benzodiazepines, and marijuana. (*Id.*) Although the psychiatric unit was concerned for Plaintiff's welfare, they were not comfortable admitting her due to the

4

levels of substances in her system. (*Id.*) David Hill, M.D., diagnosed Plaintiff with adjustment disorder and substance dependence, and referred Plaintiff to Washington County Community Mental Health Services. (R. at 1325.)

Plaintiff began treatment with Mental Health Services on May 25, 2004. (R. at 1309.) Police had arrested Plaintiff for taking Xanax without a prescription and had referred her to Mental Health Services for possible depression. (*Id.*) Plaintiff reported multiple deaths in the family and that she had been taking Xanax for two years. (*Id.*) Plaintiff reported marijuana use. (*Id.*) Although Plaintiff was working, she indicated that she was having problems with motivation. (R. at 1309.) The healthcare providers at Mental Health Services diagnosed Plaintiff with major depressive disorder and polysubstance abuse.[3] (R. at 1307.) They assigned a Global Assessment of Functioning ("GAF") score of 45.[4] (R. at 1306–07.) Mental Health Services' records reflected that Plaintiff did not improve upon discharge in March 2005, and indicated there was no changes to Plaintiff's diagnoses or GAF score. (R. at 1340.)

State agency physician Caroline Lewin completed a psychiatric review technique of Plaintiff on October 26, 2005. (R. at 1444.) She felt, however, that there was insufficient evidence in the record to evaluate Plaintiff's mental condition from April 1997 to October 2005.

---

[3] Patricia Amos, MSN, RN, CS, completed Plaintiff initial intake form and Todd Hawkins, M.D., reviewed the form. (R. at 1306.)

[4] "GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "A GAF score of forty-one to fifty indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 665 n.2 (6th Cir. 2009) (internal quotations omitted).

(*Id.*)

On July 6, 2007, Dr. Charles Merrill diagnosed Plaintiff with depression and prescribed Zoloft. (R. at 1220.)

Psychologist Gary S. Sarver, Ph.D., performed an evaluation of Plaintiff on August 28, 2007 at the request of the state agency.[5] (R. at 1368–73.) Dr. Sarver noted that Plaintiff had gone to college for three years and earned a 2.4 grade point average. (R. at 1373.) At the time of the evaluation, Plaintiff reported she had been working as a waitress, for thirty hours per week, for the past six months. (*Id.*) Dr. Sarver indicated that Plaintiff had no history of suicide attempt, but did have "low lethality suicidal ideation." (R. at 1372.) Plaintiff reported daily activities of cooking, dishes, laundry, shopping, and paying bills. (*Id.*) She was pleasant and cooperative, but yawned repeatedly during the interview. (R. at 1371.) Dr. Sarver noted that Plaintiff had a poor work history and had been fired several times. (R. at 1370.) Plaintiff did not feel she was able to work because of her criminal background. (*Id.*)

Dr. Sarver diagnosed Plaintiff with personality disorder; cannabis and alcohol abuse; and adjustment disorder with depression and anxiety. (R. at 1369.) Dr. Sarver assigned Plaintiff a GAF of 53, noting that her performance appeared reliable.[6] (*Id.*) He opined that Plaintiff's

---

[5] The record also contains what appears to be the last two pages of a three page evaluation of Plaintiff. (*See* R. at 1390–91.) The evaluation diagnoses Plaintiff with major depressive disorder, personality disorder, and a GAF of 60. (R. at 1390.) Nevertheless, given that the first page of the report is missing, it is unclear who conducted this evaluation. Furthermore, although the report is time-stamped as received August 24, 2007, it is unclear exactly when the evaluation took place.

[6] "A GAF score of fifty-one to sixty indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Collins*, 357 F. App'x at 665 n.2 (internal quotations omitted).

6

ability to relate to others was moderately limited; her ability to understand and follow simple instructions was not limited; her ability to maintain attention and perform simple tasks was not limited; and her ability to manage daily work stresses was moderately limited.  (R. at 1369–70.) Dr. Sarver further opined that Plaintiff is "likely to have difficulty organizing, structuring, and working toward goals," and "is likely to have difficulty containing her anger, managing her frustration, and controlling her impulses."  (R. at 1369.)

On September 23, 2007, state agency reviewing physician Joan Williams, Ph.D., evaluated Plaintiff's mental condition based on a review of the record.  (R. at 1460.)  Dr. Williams specifically considered the period from June 25, 2007 until September 23, 2007.  (*Id.*) Dr. Williams did not find that Plaintiff's adjustment disorder, personaility disorder, or cannabis and alcohol abuse met the requirements of a listed impairment.  (R. at 1452–57.)  Dr. Williams also concluded that Plaintiff did not have a severe impairment.  (R. at 1460.)  Dr. Williams opined that Plaintiff had no restrictions of daily living activities; mild restrictions in maintaining social functioning; mild restrictions in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (R. at 1450.)

It appears that Dr. Williams based her opinion on the consultive examination that Dr. Sarver performed.  (R. at 1448.)  Dr. Williams, however, found Plaintiff's allegations of mental deficiency to be only partially credible.  (*Id.*)  Dr. Williams suggested that Plaintiff's work as a waitress demonstrated that she could conform to workplace norms.  (*Id.*)  Ultimately, Dr. Williams opined that the record did not establish "a pattern of severe or substantial mental functional deficiency."  (*Id.*)

On March 10, 2008, state agency physician Alice L. Chambly, Psy.D., reviewed Plaintiff

7

mental condition from July 1, 2004 through June 24, 2007.  (R. at 1424.)  Dr. Chambly, however, did not find sufficient evidence to evaluate this period.  (R. at 1412, 1424.)  On March 11, 2008, Dr. Chambly affirmed the opinion of Dr. Williams for the period from June 25, 2007 until September 23, 2007.  (R. at 1427.)

The record reflects that Plaintiff underwent counseling for drug rehabilitation from December 2007 until at least April 2009.  (R. at 834–940.)  Plaintiff was pregnant during much of this period and gave birth to her daughter in June 2008.  (R. at 885.)  Upon admission, Plaintiff's counselor diagnosed her with cannabis dependence and a history of depressive disorder.  (R. at 834.)  The counselor indicated that Plaintiff's GAF upon admission was 61.[7] (*Id.*)  In June 2008, the counselor indicated that Plaintiff's cannabis dependency was in early full remission and that her GAF had improved to 70.  (R. at 834.)  Counseling notes from after June 2008 generally reflect that Plaintiff was doing well, but having trouble finding work.  (*See, e.g.*, R. at 914, 918.)  Plaintiff, however, was hired to work at the Texas Roadhouse in March 2009.  (R. at 934.)

Psychologist John Atkinson, Jr., M.A., performed an evaluation of Plaintiff in June 2010.  (R. at 350–60.)  During the clinical interview, Plaintiff's reasons for disability included her inability to get along with others.  (R. at 351.)  Plaintiff reported depression since the age of fifteen.  (*Id.*)  Plaintiff admitted to extensive drug use beginning at age fourteen, and noted that her last drug use was in August 2009.  (R. at 353.)  Plaintiff indicated that she was currently employed at the time of the interview.  (R. at 355.)   Based on his review of Plaintiff's records,

---

[7]  "GAF scores in the range of 61–70 are intended to indicate some mild symptoms or some difficulty in social, occupational, or school functioning . . . ."  *Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 745 (6th Cir. 2011).

Mr. Atkinson opined that Plaintiff's personality disorders "have been sort of minimized when in fact they are her major impairments." (R. at 354.) Mr. Atkinson found Plaintiff's concentration, attention, and judgment to be normal. (R. at 357.) MMPI-II testing produced results of highly questionable validity. (*Id.*)

Mr. Atkinson diagnosed Plaintiff with anti-social personality disorder; mood disorder with depressive and anxiety features; and polysubstance dependence in early remission. (R. at 359.) He assigned a GAF of 50. (*Id.*) Mr. Atkinson opined that Plaintiff was not likely to be "capable of sustaining any kind of gainful employment or sustained effort . . . ." (R. at 359.) Mr. Atkinson did not expect Plaintiff condition to change in the future. (*Id.*) Furthermore, Mr. Atkinson opined that Plaintiff had marked limitations in her ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, behave in an emotionally stable manner, and relate predictably in social situations. (R. at 364–65.)

### IV. EXPERT TESTIMONY

C. David Blair, Ph.D., testified as a medical expert at the April 2010 administrative hearing. Dr. Blair concluded that further records would be useful in assessing the effects of Plaintiff's traumatic brain injury on her behavior. (R. at 1512–13.)

John C. Linton, Ph.D., testified as a medical expert at the July 2010 administrative hearing. Dr. Linton stated that he had reviewed the record, including Mr. Atkinson's June 2010 report. (R. at 1526.) Dr. Linton also indicated that due to the lack of current records, he had reviewed Plaintiff's MySpace page. (R. at 1526–27.) Dr. Linton suggested that "the only thing [h]e found interesting" from the internet entries was the fact that Plaintiff had been working. (R. at 1531.) Based on Mr. Atkinson's report, Dr. Linton evaluated Plaintiff under section 12.08 of

the listing requirements for personality disorders.  (R. at 1532.)  Dr. Linton indicated that

Plaintiff met part A of section 12.08, but did not offer a specific opinion as to part B of section

12.08.  (R. at 1532, 1534–35.)

## V.  ADMINISTRATIVE DECISION

ALJ Beran found that Plaintiff was not disabled within the meaning of the Social

Security Act in his July 20, 2010 decision.  The ALJ indicated within his decision that he

considered Plaintiff's condition from April 5, 1997.  (R. at 13.)  For the purposes of disability

insurance benefits, however, the ALJ found Plaintiff met the insured status requirements from

July 1, 2007 through September 30, 2010.  (R. at 15.)  Although the ALJ noted that Plaintiff had

worked since her alleged disability onset date, he found that Plaintiff's work did not rise to the

level of substantially gainful activity.  (R. at 15.)

At step two of the sequential evaluation process,[8] the ALJ concluded that Plaintiff had

---

[8]  Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.      Is the claimant engaged in substantial gainful activity?
2.      Does the claimant suffer from one or more severe impairments?
3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001).

various medically determinable impairments including traumatic brain injury, major depressive disorder, cannabis abuse, alcohol abuse, and personality disorder.  (R. at 15.)  The ALJ, however, determined that none of these impairments, alone or in combination, significantly limited Plaintiff's ability to perform basic work activities for twelve consecutive months.  (R. at 19.)  Accordingly, the ALJ concluded that Plaintiff does not have a severe impairment or combination of impairments.  (*Id.*)  In reaching this conclusion, the ALJ gave significant weight to the September 2007 opinion of Dr. Williams as well as Dr. Linton's hearing testimony.  (R. at 23–24.)  The ALJ gave little weight to the opinions of Mr. Atkinson and Dr. Sarver.  (R. at 22–23.)  The ALJ concluded that, with regard to Plaintiff's mental functioning, she had no limitation in activities of daily living; mild limitation in social functioning; mild limitation in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (R. at 25.)

Because of the lack of a severe impairment, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 25.)  The ALJ also concluded that, for the purposes of child insurance benefits, Plaintiff was not disabled prior to attaining the age of twenty two.

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the Commissioner's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

Within her Statement of Errors, Plaintiff raises two distinct issues. First, Plaintiff maintains that the ALJ erred by relying on the testimony of a medical expert who considered material outside of the record. Second, Plaintiff maintains that substantial evidence does not support the ALJ's severe impairment determination.

## I.    Medical Expert Testimony

During his testimony at the June 2010 administrative hearing, Dr. Linton admitted that he reviewed pictures and entries on Plaintiff's MySpace page because he found a lack of recent information in the record.  Plaintiff suggests that Dr. Linton's consideration of this information was improper under the Regulations.  *Cf.* 20 C.F.R. § 404.1519q (suggesting that physicians and psychologists who have prior knowledge of a case will not participate in case review).  Plaintiff also asserts that the ALJ should have given her an opportunity to object to Dr. Linton's testimony.

At least some federal courts have found that it is improper for an ALJ to consider information outside the record in determining disability.  *See, e.g.*, *Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997) ("We agree with the district court that it was improper for the ALJ to consider evidence outside the record in determining the extent of [the claimant's] disability.")  It may follow that a medical expert, assigned to review the case record and offer opinion evidence, may not properly consider outside evidence even if such evidence is publicly accessible.  The undersigned, however, does not find it necessary to reach this issue.

Even if the ALJ erred in permitting the testimony of Dr. Linton, such error was harmless.  As the United States Court of Appeals for the Sixth Circuit has highlighted, the Court generally "reviews decisions of administrative agencies for harmless error."  *Rabbers*, 582 F.3d at 654.  "Accordingly, if an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses."  *Id.* (internal quotations omitted).  Furthermore, the Sixth Circuit has suggested that "where remand would be

an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (internal quotations omitted).

Here, any error with regard to Dr. Linton's testimony was harmless. First, Dr. Linton's testimony suggested that viewing the outside material did not have any significant impact on his testimony. Dr. Linton testified that the only thing he found interesting from the internet entries was that Plaintiff was working. (R. at 1531.) Nevertheless, Plaintiff admitted to working at the administrative hearing. (R. at 1533–34.) Furthermore, Mr. Atkinson's June 11, 2010 report, which Dr. Linton reviewed the day of the hearing, also indicated that Plaintiff was working.

Second, Dr. Linton's opinion was not ultimately relevant to the ALJ's severe impairment determination. Dr. Linton did not testify at the June 2010 administrative hearing regarding whether Plaintiff's mental impairments were severe. In fact, the only concrete opinion Dr. Linton gave regarding Plaintiff's condition was that she met part A of Section 12.08 of the Listing Requirements. Although the ALJ stated that he gave Dr. Linton's opinion significant weight, his decision ultimately rested on the determination that Plaintiff did not have a severe mental impairment or combination of impairments. Because Dr. Linton did not testify regarding this issue, Dr. Linton's opinions could not have had any prejudicial impact on Plaintiff. Furthermore, the ALJ made clear at the hearing that he was not going to consider the internet entries in the case. (*See* R. at 1522.) His written decision addressed the information only to the extent that he summarized Plaintiff and Dr. Linton's testimony. (R. at 24.) Accordingly, remand on this grounds would be a mere formality.

Plaintiff briefly argues that the ALJ erred by failing to ask her, or her attorney, whether

14

they objected to Dr. Linton testifying.  The undersigned also finds that any error in this regard was harmless.  Plaintiff was represented by counsel at the hearing.  The administrative hearing transcript reflects that counsel was able to adequately raise concerns regarding Dr. Linton's testimony.  Under these circumstances, the undersigned infers that counsel was aware that she could object to the medical expert.  Regardless, Plaintiff has not presented any reason to believe that Dr. Linton was not qualified to testify as a medical expert.  Furthermore, as described above, Dr. Linton's testimony was not ultimately relevant to the ALJ's disability decision.

## II.      Severe Impairments

In her second contention of error, Plaintiff maintains that substantial evidence does not support the ALJ's severe impairment determination.  As detailed above, although the ALJ found that Plaintiff had a number of medically determinable impairments, including depressive and personality disorders, he concluded that none of these impairments, alone or in combination, was severe.

### A.      Waiver

As a preliminary matter, the undersigned must determine whether Plaintiff has waived this argument.  Specifically, Defendant contends that due to the limited nature of Plaintiff's briefing, she has waived any argument on this grounds.

The Sixth Circuit has held that "[i]t is well-established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (internal quotations omitted).  Similarly, "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*,

125 F.3d 989, 995–96 (6th Cir. 1997); *see also Przytulski v. Astrue*, No. 1:11–cv–1518, 2012 WL 2025299, at *6 (N.D. Ohio June 5, 2012) ("The Court will not cull through the record and speculate on which portion of the record a party relies; indeed, the Court is not obligated to wade through and search the entire record for some specific facts that might support a party's claims.").

In this case, despite the extensive nature of the record, Plaintiff offers minimal development of the severe impairment issue. Within her Statement of Errors, Plaintiff offers less than two pages of briefing on the issue. This briefing consists of a general description of severe impairment law, a brief summary of the ALJ's decision, and a paragraph of case specific analysis. Within the analysis, Plaintiff fails to cite to any specific medical evidence within the record and instead relies on a few references to Plaintiff's testimony.

Under these circumstances, the undersigned finds that Plaintiff has waived any argument that Plaintiff's physical impairments, alone or in combination, amount to a severe impairment. With regards to her physical condition, Plaintiff only offers the cursory contention that the record is replete with physical treatment. She offers no guidance to the Court, however, as to which of her physical conditions, and what medical evidence, supports a severe impairment finding.

The Court would also be justified in finding that Plaintiff waived arguments concerning her mental impairments. In an abundance of caution, however, the Court will consider whether Plaintiff's mental conditions amount to a severe impairment. Although Plaintiff does not cite supporting medical evidence within her Statement of Errors, she does highlight portions of her own testimony to suggest that her mental limitations inhibit her work abilities. Additionally,

16

although the Commissioner argues waiver, he was clearly on notice of Plaintiff's contention. Specifically, the Commissioner submitted detailed argument, in the alternative, as to why substantial evidence supported the ALJ's mental limitation decision.  Finally, within her Reply, Plaintiff does cite specific medical evidence to suggest that the ALJ erred in concluded that her mental impairments were not severe.

### B.      Mental Impairments

At step two of the sequential evaluation process, the Commissioner must consider whether a claimant has a severe impairment.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "To surmount the step two hurdle, the applicant bears the ultimate burden of establishing that the administrative record contains objective medical evidence suggesting that the applicant was 'disabled,' as defined by the Act . . . ."  *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 929 (6th Cir. 2007).  The Regulations generally define severe impairment as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).  From a mental perspective, basic work activities include the ability to understand, carry out, and remember simple instructions; use judgment; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).

The Sixth Circuit has generally described step two of the evaluation process as "a *de minimus* hurdle."  *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190 (6th Cir. 2009) (internal quotations omitted).  Accordingly, "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Id.* (internal quotations omitted).  The mere existence of impairments, however,

does not establish significant limitation in "performing basic work activities for a continuous period of time." *Despins*, 257 F. App'x at 930.  Furthermore, in considering whether a claimant has a severe impairment, an ALJ need not accept unsupported medical opinions or a claimant's subjective complaints. *McDaniels v. Astrue*, No. 1:10–CV–699, 2011 WL 5913973, at *4 (S.D. Ohio Nov. 28, 2011).

Substantial evidence supports the ALJ's conclusion that Plaintiff's mental impairments were not severe.  Despite her alleged onset date in April 1997, Plaintiff was able to graduate from high school in 2001 and then complete three years of college.  Furthermore, the record evidence suggests that Plaintiff engages in relatively extensive daily activities.  For example, on July 20, 2007, Plaintiff self-reported cooking, cleaning, doing laundry, shopping, and socializing with friends and family.  (R. at 330–32.)  Similarly, in August 2007, Plaintiff informed Dr. Sarver that she participated in various "day-to-day demands including shopping, bill paying, and household management."  (R. at 1373.)  The record reflects that Plaintiff has worked during various portions of her alleged disability period including a sixth month period as a waitress and a five month period as a telemarketer.  (R. at 1373, 1540.)  At the time of the administrative hearing, Plaintiff had begun another waitress position and was expecting to work twenty to thirty hours per week.  (R. at 1533–34.)  Although Plaintiff suggests that she is unable to hold onto positions due to her mental limitations, as the ALJ noted, the record suggests other possible reasons for Plaintiff's sporadic work history.  In August 2007, for example, it appears Plaintiff herself indicated that she could do more work, and receive better positions, if it was not for her

criminal record.[9]  (R. at 1390.)

Much of the medical record also supports the ALJ's conclusion with regard to a lack of any severe impairments.  Most directly, in September 2007, Dr. Williams opined that Plaintiff did not have a severe mental impairment.  She further opined that Plaintiff had no more than mild limitations in activities of daily living, social functioning, and concentration, with no episodes of decompensation.  *See* 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1) (indicating that if limitations in these areas are mild or none, a finding of no severe impairments generally follows).  Dr. Williams stressed that these findings were consistent with Plaintiff's ability to perform the challenging role of a public waitress.  Dr. Chambly affirmed this opinion in March 2008.  Given the relatively extensive nature of Plaintiff's activities, the functional opinions of these reviewing physicians appear consistent with the record.  Furthermore, in 2008, when Plaintiff's substance abuse was in early remission, Plaintiff was assigned a GAF of 70, placing her at the high end of a score range suggesting only mild symptoms.  Finally, despite the extensive nature of the medical evidence, and the considerable period of Plaintiff's alleged disability, Plaintiff's record of mental health treatment contains significant gaps.  Although a variety of reasons could explain Plaintiff's treatment record, one plausible inference is that Plaintiff did not find her mental impairments severe enough to require consistent treatment.

In concluding that Plaintiff had no severe impairments, the ALJ gave little weight to the consulting examination opinions of Dr. Sarver and Mr. Atkinson.  The opinions of these medical sources suggest that Plaintiff's mental conditions satisfy the severe impairment barrier.

---

[9]  Additionally, the record suggests that Plaintiff may have lost her telemarketing position because she went to prison.  (R. at 241.)

Nevertheless, the record reflects that the opinions of these physicians are unsupported.  For example, although Dr. Sarver ultimately suggested that some of Plaintiff's limitations were moderate in severity, his observational findings generally placed her within normal limits.  (*See* R. at 1370–71.)  Notably, based on her review of Dr. Sarver's evaluation, Dr. Williams felt that Plaintiff had no severe impairments and only mild functional limitations.  Mr. Atkinson's opinion also appears at least somewhat questionable.  After a one-time consultation, Mr. Atkinson drew restrictive conclusions regarding Plaintiff's functional ability.  Mr. Atkinson's report suggests that, in reaching these conclusions, he considered Plaintiff's personality disorders to be her "major impairments" and her "major difficulty" outside of physical problems.  (R. at 354.)  Nevertheless, Mr. Atkinson admitted that Plaintiff's personality disorders were "minimized" throughout Plaintiff's records.  (*Id.*)  Furthermore, Mr. Atkinson's final conclusions that Plaintiff is incapable "of sustaining any kind of gainful employment," and that she has marked limitations in a number of work-related areas, are belied by the fact that she was able to hold down positions of employment for multiple months at a time.  (*See* R. at 359.)

Ultimately, from the record evidence as a whole, the ALJ was reasonable in concluding that Plaintiff's mental impairments had only minimal affects on her work abilities.  *See Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.") (internal quotations omitted).  In this case, the ALJ was within his permissible zone of choice in concluding that Plaintiff did not have severe mental impairments.

## VIII.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **AFFIRM** the decision

of the Commissioner of Social Security.

## IX.  NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816*, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date:   July 10, 2012                                     /s/ *Elizabeth A. Preston Deavers*
                                                                          Elizabeth A. Preston Deavers
                                                                          United States Magistrate Judge